My name is Billy Wilkins and Kirsten Small and I represent Jonathan Pinson. In drawing up this 52 count indictment, the government used certain key words like public official, like under the care and control of, and like an agent of, just to name a few. Key words that the government erroneously used in the indictment. would advance its prosecution of Jonathan Pinson. But in fact, it should prove fatal to its case. The government draws up an indictment. The defendant must defend against the words defining the allegations against him. And the government must live with the words it chose. The government cannot have its indictment. And then after the trial, amend it to say what it wishes it had said. Before addressing count one, the RICO count, I'd like to first address the four types of predicate acts set forth in the indictment. The first one is honest services fraud involving the homecoming concert and the sportsman retreat activity. There were a number of counts. Jonathan Pinson was found not guilty on all of them except two, count 12 and count 18. Count 12 is based on an August 25, 2011 telephone conversation. But you're going to get back to RICO and government theft. Yes, sir. Okay. In any event, this telephone conversation, 23 days after the homecoming contract was signed, as well as the October 13 telephone conversation, that's count 18, simply are not official acts. Apparently recognizing that the change in the law that McDonnell made, the government on page 28, footnote four, states as follows. In any event, Pinson aided and abetted Gilman's commission of an official act by the signing of the concert promotion contract with Wee Entertainment on behalf of the university. First of all, that's not true. But most importantly, it was never, this language was never alleged in the indictment. But what was alleged, what was alleged is that Pinson committed honest services fraud because he was a public official. The government asked the judge to charge the jury before the first witness was called, preliminary charge. The government submitted the charge and here's what it said. An elected official of the board of a state-supported university, Pinson was a public official and required to report certain benefits that he received as a public official to the South Carolina Ethics Commission. During his initial charge, the court said, this is the first element that the government must prove, that he was a public official. After the testimony, the court addressed the government's attorney and says, you agree that the charge, that one of the elements is that he's a public official as defined by South Carolina state law. That's at JA 1559. Throughout the entire trial, the government said he's a public official as defined by South Carolina and that's what Pinson defended at JA 1584. The government represented to the court, both parties agree that this determination, whether he was a public official, we need to look to state law. JA 1612, the government's attorney says to the court, everyone agrees that South Carolina controls, Your Honor. Well, when finally the government realized this mistake, that is that Pinson was not an official as defined by South Carolina law, they said, well, he's still a public official by whatever you want to call it. That's at JA 1612. The government then tells the court, let's amend our indictment. We'll just amend it and take out the words public official. The court said to the government's attorneys, the problem you got is earlier you said he was a public official defined by South Carolina law. And clearly, South Carolina law does not define Mr. Pinson as a public official. Well, regardless of what the government said, I thought the indictment said that it charged him with violating his fiduciary duties as a public official, including his responsibilities that he might have had under South Carolina law under the state ethics commission. That doesn't seem to me to be inconsistent with the notion that public official is broader for purposes of the indictment. Well, I think a fair reading, an objective reading, a reasonable reading of the indictment, they were talking about the fact he was a public official because he had to report, and because of that he had to report to the South Carolina ethics commission. And only public officials as defined by that statute will have to report to the ethics commission. But even if that's not the case, under the common law of South Carolina, the Bailey case, recently decided by the South Carolina Court of Appeals, under the common law of South Carolina, Pinson would not be a public official. Well, what does the common law of South Carolina have to do with whether or not he was a public official for purposes of a federal indictment? Because the government alleged that he was a public official, and they maintained that he was a public official as defined by the law of South Carolina. Not only does the indictment, I think, say that, but they said that over and over again in representations to the court. Now, I know the government didn't have to draw it this way. They could have drawn it more narrowly, perhaps, or more broadly, but they chose to say honest services fraud was committed, and that was because he was a public official as defined by the law of South Carolina. They got to live with it. He was not, and that consequently he could not be, those counts should be vacated. Now, what the court did was take a break, comes back and says, finally the government says, well, let's define it by federal law, but they offer no suggestion as to what that definition should be. So the court takes a break, comes back and says, I'm going to charge blacks law dictionary definition, which is a public official is one who holds or is vested with a public office or one who exercises the powers of a sovereign. Well, there's no question he was not exercising the powers of a sovereign. No one even maintains that. So the court said a public official is one who holds a public office. That's like saying an office is a public office if it's held by a public official. And, of course, the jury comes back in its deliberations. What is a public official? If you sit on the board of trustees of South Carolina State University, are you a public official? The court said, I refer you to the definition I've earlier given. Well, in its brief, the government said, well, that's just irrelevant how Pinson's status was defined by state law. Well, it's been relevant for 125 years since the United States Supreme Court decided the Sterling case. Well, the government chooses its word, it chooses its language, and they have to live with what they put in the indictment. The other next predicate act is the mail fraud, the diapers factory in Marion County. And what that indictment does is it counts 25 and 26. What that indictment said is detailed more specifically in count two, so it incorporated count two. So that meant that counts 25 and 26 read and charge and allege that a theft occurred of federal grant funds under the care and control of Marion County. Well, that's just not correct. Here's what is correct. Here's what the government's own testimony from their witnesses said. First of all, at JA701, Cindy Turnipseed, who works for the State Commerce Department, she testified about the process, how invoices are submitted and how they get the checks and so forth. And she says the grants, that is the grant money that they have, offer reimbursement. At JA815, the county administrator of Marion County says, we put them, the invoices, in a requisition package for the state for reimbursement. He then goes on to say invoices had to be turned in and submitted to the state for reimbursement. Now, Mims, another government witness, testified that he would collect invoices and submit them to Marion County for payment. He said some contractors submit their invoices directly to the county. What happens then, the question was asked. At JA1124, he says the Marion County, in turn, will issue a check to that entity. Thus, the funds were always, always the federal funds under the control of the Commerce Department of the State of South Carolina. They were never under the control of Marion County. So if we were to determine that the conviction under count two was defective, how would that affect your arguments as to these two counts? It would, it, well, count two is incorporated into these two counts. Right, but count two stands on its own, doesn't it? Well, it stands on its own itself, and that's, that count two is dealing with the Isn't that the government theft argument? Yes, sir. That's the government theft, but that's, of course, that should fall for a different reason. But the allegations of count two are incorporated into 25 and 26, which means count 25 and 26 is Pinson, you stole government funds. That was my question, if we found that count two was defective for the alternative reason that I take it that you argue, that Mr. Mims was not an agent for purposes of the government theft statute. What effect does that have on these two later? None. None, okay. Because the allegations, not the elements of the crime, but the allegations flow into 25 and 26. The government says, well, we did, the indictment says we incorporate count two, but that means that we don't have to prove the elements of count two. Well, of course, they don't. But the allegations of count two are now made a part of count 25 and 26, and these factual allegations simply, there's no evidence, no evidence to support them. And then the government says, well, that's all irrelevant, because Marion County is a political subdivision of South Carolina. Well, I don't know whether it is or not necessarily, but this is raised for the first time. A fraud against Marion County, the government says, is a fraud against the state of South Carolina. No citation to any authority. The next predicate act is wire fraud. That's the village at River's Edge. In essence, Mr. Pinson's LLC would send in invoices to the Columbia Housing Authority on a periodic basis. Mr. Wilkins, before you get to it, let me go back to this issue about Marion County and care and control. The operative word is care and control, and while the county may not have had physical possession of the funds, why wasn't it enough to say that they were responsible for the protection of those funds, and that's enough? Well, I didn't say that, number one, but number two, when the funds were sent from Columbia Commerce Office in Columbia, South Carolina, and they reached Marion County, they were no longer federal funds. They were the county's funds. They were for reimbursement for county money that had already been spent in paying off the various invoices that were submitted. Now, granted, I agree, Your Honor, this indictment could have been drafted a different way. It may have said he defrauded the Columbia, I mean, the Commerce Department, through Marion County by submitting these things. But he didn't do it. I mean, the indictment didn't do it. He defended on the words and the allegations that were made against him. Well, your time, of course, is yours. But you did say that you were going to get to the retail and government theft charges. All right. Well, I will – I'll talk about the – let's see here. Why don't we start with why you think the – on the RICO conspiracy charge, why there is not an enterprise for RICO purposes? Yes. Well, I'm sure the court knows that in this case, it's an association, in fact, enterprise. That's what the government alleged. And if you have an association, in fact, enterprise, there has to be a common purpose. There has to be a common purpose. It is the reason that the members of the enterprise came together. It is different than the commission of the Predicate Act this court has said. It is not – it is not, as the government maintains, making money. That may be a goal of an enterprise, but the purpose is separate and apart. And here there is no separate and apart purpose. Just like in the Griffin case that this court decided. Individuals were involved in gambling operations in Baltimore, independent illegal gambling. They were indicted, charged with RICO. This court says it's a close case, but we think there's enough there to say there was a common purpose. The common purpose wasn't to make money through gambling. That would have been an easy case because the gamblers all admitted that's what we did, make money through gambling. But the purpose was, this court said, to come together to corrupt the Baltimore Police Department. The purpose is separate and apart from the goal. And that's what this – one of the main reasons this RICO charge, count one, is invalid. And it's invalid for several other reasons, but I needn't go no further because clearly the government admits it. The purpose was to make money. That was the purpose of this enterprise. That's not enough. There have to be some – As I understand the government's argument, and I'll have their opportunity to describe this, they see the enterprise as one entity comprised of the events at South Carolina State and then these other business ventures. That's altogether the enterprise. If we were to determine that the connections there were too tenuous so that in effect you have the events at South Carolina State on one hand, separate and apart from whatever may have occurred with the diaper factory and the housing unit, is there an argument in this case that those events standing on their own, that the South Carolina State events in and of themselves can constitute a RICO conspiracy? Well, as I understand your question, we're going to take South Carolina events and let them stand alone. Those two events. And then you've got the diaper factory and the village at River's Edge. Is there an argument that those events, if you take them, separate them out like that, that standing alone either of those amounts to a RICO? Well, I guess the argument may be this court is advised against that because if RICO is based on wire fraud or mail fraud, then every wire fraud, every garden variety mail fraud is going to be a RICO account. And that's what this court said out of a boot case. We caution against bringing RICO on predicate acts of mail and wire fraud because it would be the unusual case that does not enlist mails and wire in the service at least twice. We preserve the RICO for something other than the ordinary garden variety fraud claim. We reserve RICO where there is a special threat posed to social well-being. I don't think the argument can be made. I don't think it can prevail on the circumstances that you suggest. And you know, and as you point out, the characters at the state, the participants at the state university, we don't see them again except for Robinson. He plays a small role in the diaper factory. So you've got different participants and all occurring within a very small period of time, maybe two years. Maybe if you can stretch it out. All this took place over a two-year period. Now, you've got some time in rebuttal. All right. Thank you. Mr. Booth. May it please the Court. I'd like to address the issues in the manner in which Pinson has raised them. And I think the first thing I need to do is discuss the official act issue. But it's actually two particular issues in this case, not one. There's one as it goes to the McDonnell issue and then the other issue as it goes to the constructive amendment issue. As to the McDonnell issue, our position here, that's waived. The defendant has never raised a McDonnell issue in this case except for making a one-sentence reference to official acts in his brief. But let me go on and go to the merits in case the Court were to reach it. I would like to quote from you from what exactly McDonnell said an official act is for purposes of the honest fraud statute. And McDonnell said that an official can't commit an official act by using his official position to exert pressure on another official to perform an official act. And in addition, if a public official uses his official position to provide advice to another official, knowing or intending that such advice will form the basis for an official act, he's committed an official act. Well, Pinson, as the chairman of the board of trustees at the university, committed a series of official acts. He abused his position for, in one instance, he corrupted Givens, who was an official, by the way. He was the general counsel. He basically corrupted him into helping Pinson with respect to the homecoming concert and also with respect to the sale of Sportsman Retreat. He also put a lot of pressure on all of the subordinate officials at the university to force them to change their mind about buying Sportsman Retreat. If you remember, the evidence was initially that the president wasn't interested in buying it. And Cooper, with phone calls and talking to Bartley and talking to another number of individuals, including Wesson, ultimately got them to change their mind. So there were a lot of official acts that were committed in this case, even assuming that the McDonnell issue was raised. So there's no valid McDonnell issue in this case. But what makes that relevant in this case, I take it, is that the official act is, for purposes of this statute, coupled with either cash or a porsche. Well, the official acts that he is doing, he is asking, giving advice, and he's urging, he's putting pressure on other officials, including Givens, who's the general counsel, to help him so that South Carolina, that the university will, one, contract W. There's no problem with an official doing that as long as the official receives nothing for it. Well, that's correct. When I use the expression, J.J., he corrupted Givens in both cases because, yes, what happens was Benson was going to get a porsche in one instance and get a kickback in the other, and Givens was going to get some. Actually, he got $500. And Benson promised him something that if, in fact, it turned out that the university had purchased Sportsman Retreat, although that sale never went down. So there's no McDonnell issue in this case. I would like to turn, however, to the constructive amendment claim. And that particular doctrine provides that if the jury instructions or the evidence in the case broadens the basis for conviction, to allow the jury to convict a defendant of a crime not charged in indictment, that's a constructive amendment. There is no constructive amendment in this case for the following reason. It turns out that the indictment in the honest services counts charged that Benson used his official position as the chairman of the board of trustees to commit a series of fraudulent acts here. That was the allegation that was charged. And that allegation satisfies the federal definition of a public official. Whether it satisfied the definition of a public official under state law is irrelevant. Because as this court indicated in the portion of McDonnell that was not overruled by the Supreme Court, in fact, you wrote that decision, Judge Thacker, you look at federal standards to determine bribery and kickback law. He is a public official within the meaning of the national standard. The jury instructions did not change that. Putting aside all the dispute that went on before the judge gave the instruction, all the instruction did in this particular case was to say that it defined a public official according to Black's Law Dictionary. It gave a generic jury instruction as public official. It didn't broaden the basis and to allow the jury to convict Pinson of being another public official. For example, he would have, Pinson would have a substantial claim if the jury instruction had said, even though you have been charged as being the chairman of the board of trustees, you can be convicted if you're the athletic director or if you're the vice president for student affairs. None of that ever happened in this particular case. So there was no constructive amendment of the indictment whatsoever. Let me turn now to the part about the incorporation of the count two and to the counts 25 and 26. The government's position is, is that because only Congress can create crimes, any allegation in an indictment that incorporates allegations from a previous count do not require the government to prove any of the essential elements of the previous crime because, again, only Congress can do that. And so, therefore, the fact that the government alleged and incorporated the counts of count two into the honest services, I'm sorry, into the other fraud counts, didn't require the government to prove anything with respect to count two in those counts. The government did not have to prove in those honest services counts that the money was in the care or custody of Marion County. Although, for purposes of count two, that is correct. They've never challenged count two, by the way. And the evidence at the trial indicated that they have challenged count two in terms of not the arguments you're addressing here, but as to whether or not Mr. Mims was an agent. As I understand the discussion on count two, that only because Mr. Pinson aided and abetted the agent, would he be guilty of government theft under that count. Is that correct? That is correct, Judge, but they did under count two. They never said that the money was never under the care and control of Marion County. Marion County actually issued a $62,000 check to Noel, which is a company controlled by Pinson. It was under the care and control at that time. What makes Mr. Mims an agent for purposes of Section 660? Let me start with the law first. And the law under 666 says, defines an agent can be anybody including a manager. And the case law from the Third Circuit in Vitello indicates that a construction manager can, it does qualify as a manager under 666. I think in Vitello, Mr. Vitello and his company were specifically hired as the construction managers for the airport project. There's a specific contractual agreement between the government agency and Mr. Vitello to manage the airport expansion. And I'm not aware of there being a similar arrangement here between Marion County and Mr. Mims. Well, that is true, Judge Adey. I'm not saying that Vitello is, sets forth either like a necessary step, that there has to be a particular contractual relationship between the two. The 666 gives a very broad definition of the term agent. It indicates the statutory term includes a manager. Now, in this particular case, the government submission as to why Mims was an agent was that he was responsible for collecting all of the invoices that the subcontractors were, had given to him for all the work that they had done. He would gather them all together, rearrange them, and then he would then deliver them to Marion County. So our position is when he took those, that particular job function of taking all the invoices and giving them to Marion County, he was also, he was at that point an agent for Marion County because of the function that he performed at that particular time. Now, I would like to – I can see where that might have been a false statement, obtaining money under false pretenses, but as I understood the language of that statute, an agent had to be someone who was authorized to act on behalf of the government. And that's where I'm having difficulty seeing where Mr. Mims was authorized to act on behalf of Marion County. I mean, he brought up stuff, but the UPS delivery guy could have done that. That's – is Vitello your best case as to why he's an agent? Well, that's the only case that I have, and I would like to indicate, and this is one thing I had neglected to put in my brief as the Joint Appendix 1124, not only did he deliver the invoices to Marion County, but occasionally Marion County would send him one big check that he was evidently supposed to deliver to the subcontractor. Sometimes Marion County delivered the checks to the subcontractors on their own, but sometimes they delivered, as he put it, one big check. So in that particular case, he becomes a dispersing agent for Marion County. I mean, if the check is coming to him and he gives it back out, he's got two functions here. He's taking one of the invoices, giving it to Marion County, and then Marion County is giving him the check. So in that particular case, we would submit that he is an agent because he is the project manager for Marion County at that particular point. And this is a case in which you were to look at the evidence in the light most favorable to the government, and if you look at the evidence in the light most favorable in this particular case, the evidence shows that he was an agent. I take it from your statement, this latter argument you just made, this is the first time that's been made, that acting as a dispersing agent is what makes him an agent under the statute. Well, the first time I neglected to put that particular citation in the Joint Appendix to the record, I'm sorry, in my brief, it's at 1124, and the court obviously can check it, by pointing out that he had a fairly responsible duty here as the project manager, which was to take all the checks and take them to Marion County. And obviously, Marion County at some point gave him a check. So it's a combination of the two things here that we submit make him an agent for purposes of the statute. One thing, Pinson has alleged that the government cited there's no authority in the record for the proposition that Marion County was a subdivision of South Carolina. I believe that Ms. Turpensee, and I believe that Jay cited it at 689, she indicated that South Carolina only gave grants to public subdivisions. And I think you could take judicial notice of the fact that Marion County is a political entity. It's a political subdivision of South Carolina. Judge Agee, you had gone into the question of the RICO enterprise. One of the questions that you had was whether you could narrow the enterprise if you determined that there's actually two separate enterprises here. Of course you can. If the government charges a broad enterprise, you can always narrow them as long as the narrowing would meet the definition of an enterprise. And since the government would only have to show that there was an agreement to commit two predicate racketeering acts, the Marion County and the VRE schemes would certainly qualify. But let me say that's just to answer your particular question. Up until this point, it had not been argued that the South Carolina state events in and of themselves without the addition of the business venture exercises on the diaper factory and the housing thing. It had not been argued that those events in and of themselves qualify as a RICO violation. The government charged that the enterprise in this particular case consisted of a series of fraudulent conduct. And that was the basis of the charge that there was an enterprise in this case. Now, in Turkhead, and I would like to expand on this just a little bit, Turkhead says that an enterprise is an ongoing organization whose members function as a continuous unit. And then in the Boyle decision, the Supreme Court said that those requirements are purpose, relationships, and longevity. And in the government submission, all three of those elements are met in this particular case. Who do you have besides Mr. Pinson that shows this continuity from the South Carolina state items to Columbia housing events? It seems like that he's the only common denominator. Actually, Judge A.G. Robinson is involved in both the Supreme scheme. He's the individual who introduces Brown to Pinson, and he has a small role in VRE. And then he's the bridge to the university schemes because he reappears a couple of years later when he is involved with WE Entertainment trying to get a contract that Pinson will get a kickback from. The Supreme Court has indicated that in the Boyle case that membership comes and goes. There's lots of courts of appeals decisions, one outside it in my brief, that indicates that membership changes. But you do have Robinson, who's the bridge between the two. And the graph of the chart on page 20 of our brief, in our view, accurately reflects how the members of this enterprise work. As I wanted to mention earlier, there were three elements, purpose, relationships, and longevity. The purpose here was self-enrichment through a series of fraud schemes. And in terms of money being a purpose for RICO, that's a quintessential purpose. For example, in Boyle, what was the underlying offense? Bank robbery. What's the purpose of bank robbery? To enrich its members. In most cases, and there's no doubt that obviously making money is a RICO purpose, but most cases seem to have a specific methodology. Drug sales, extortion, bank robbery, ID fraud, something along that line. And here you have, it seems, no real connection between these various events. They just kind of come up as an opportunity to make money, and they try to do that. That shows the diversity and the skill of the fraudster who can, on the one hand, Judge Agee, when it suits him to get involved in payroll fraud schemes, he does that. He gets a series of individuals who do play the common roles in the schemes, like Wright, Williams, and Mims, were involved in both of the payroll fraud schemes. Wright and Williams are the people who invest in the companies. Wright hires Mims as the project director. Robinson is involved as the greeter. He helps people get involved, and then he introduces Joy later on. So what happened? Pinson takes his opportunities as he sees them. And if there's an opportunity to commit fraud by payroll fraud, he does it. And then if there's an opportunity to commit fraud on the services fraud or by using kickbacks, he does that too. That just goes to show you the sophistication of the enterprise. It doesn't show that there were two things here. Fraud can be committed in different ways. You said there was a sophistication of the fraudster, and then what you described was something that sounded like, yeah, an individual fraudster, not an enterprise. But there, Judge Thacker, again, as I mentioned earlier, again, I would urge you to look at page 20 on our brief where I have pointed out how the individuals work in each one. You have the individuals working in the same roles in each one. For example, Gibbons, he's the general counsel in the university scheme, so what does he do? He signs a contract for the concert, and he also sends a letter of intent to Zahn. Now, in the other two schemes, you have Wright, Williams, and Mims doing the same roles continuously. That shows the continuous relationship, and that shows why these are not just individual isolated events but a continuous one. And with respect to the longevity issue, I would like to point out that the schemes lasted about 24 months from November 2009 to 2011, and so that satisfies the third prong of the test in Boyle. Let me ask you about count three before your time runs out, because the indictment charges that Mr. Pinson and Mr. Mims, as agents of VRE, which was Pinson's entity that had contracted with the Housing Authority, that they received benefits. It has to be a benefit, as I understand it, under Section 666. But there's also an exception in the statute for fees and other compensations paid in the ordinary course, and there are lots of cases that talk about the statute isn't intended to apply in a commercial transaction setting. So the payments that VRE got for construction of housing, which I take it it's agreed that the houses were built, why isn't that a commercial compensation that's excluded under the statute? If you're referring to the cases that they cited, I would note, first of all, I believe that all the cases that they cite predate the Supreme Court's decision in Fisher, and also that the facts in this particular case are very, very close to the Court of Appeals' decision in Hildebrand, which I've cited in our brief, which also involved a case in which HUD grant money was being given to, I believe, some nonprofit or a profitable housing agency. And the Court of Appeals had little difficulty in light of Fisher in concluding that, in light of the fact that HUD normally has to oversee the projects that it develops. For example, in this particular case, Pinson had to file his periodic payment estimates on HUD forms. And so what you have here is that you have a HUD grant, HUD having control over it to the point of requiring HUD forms to be filed. And so the government's position in this case is we would ask the court to follow Hildebrand, that there were benefits in this particular case. So that's a false statement. I can see that part. But the money that came to this entity, VRE, which is the entity that, as I read the indictment, they say the theft was made from, isn't a government entity. It was receiving payment for work performed. I believe the statute 666, I believe it also says, involves not just a government entity but organizations as well. So that, again, I believe in Hildebrand you had something similar where you had funds flowing to an individual who was running some sort of housing agency or some program that was taking the grant money and was supposed to develop it for affordable housing. And the Court of Appeals had little difficulty, in fact, held that those were benefits in that particular case. The reason it was theft is because he didn't pay his subcontractors. Well, he was skimming the money, right. Whether or not this constitutes an embezzlement theory or under-obtains by fraud theory, he was taking money. This was not bona fide compensation. Any further questions? Thank you very much. Mr. Wilkins. Well, thank you, Mr. Chairman. I was married in my years of subdivision in the state of South Carolina. It was not alleged, but what was alleged, that it controlled federal funds and it had care and control of federal funds. Not proven whatsoever. As far as count two and three, the theft of government funds, I'd just like to point this out. On page 24 of the government's brief, it asserts that Colin Brown, who was the fellow that owned the diaper factory down in Georgia that moved it to Marion County, they say testified that MEMS oversaw the construction at the diaper building on behalf of Marion County. The government cites the JA868. This is a gross misstatement. Here's what 868 says and what Colin Brown testified to. He was asked, who was overseeing the upfitting on behalf of your group at Marion County? Answer, Phil MEMS. He was then asked, who was paying him? Were you paying him for this work? Yes. And then MEMS gets on the stand. He never testifies that he did anything for Marion County because he was never asked the question by the government attorney. As far as count three is concerned, alleged that VRE received federal benefits. It had a contract with the Columbia Housing Authority to build 60 housing units. That's what it did. It had SK as a subcontractor. It was not receiving benefits or federal assistance. It was just a person that had a contract like Lockheed has a contract to build airplanes for the government. That's not federal assistance. That's not federal benefits. But that's what the government charged. That count certainly cannot stand. As far as the RICO count is concerned, if you break them out, Judge, you won't have a RICO at South Carolina State University because you only have one predicate, alleged that it's false, honest services fraud. As far as the other two are concerned, let me refer you to the Anderson case. This is written by Chief Judge Irvin. He said, and I quote, the desire to obtain money or property by false or fraudulent pretenses is not enough to distinguish Anderson's claim from ordinary fraud claims. A RICO enterprise does not exist where the government failed to present a factual claim that the RICO defendants had an interest in the outcome beyond the alleged scheme for their own individual interest. And then, again, I implore the court to just take a stand back and say, is this the kind of activity that we want to classify as RICO? It was designed to go after really societal harm, organized type activities with a purpose, special purpose, over and above the predicate acts that were going to be committed. Just like the case from this court in Palacio, I believe it's pronounced. But anyway, that was a gang activity. They committed all kinds of things in Baltimore, but the purpose was to gain a reputation for toughness, not because they were trying to get something. The goal was to get money through drug operations and so forth, but their purpose was to come together for the purpose of being organized or at least presenting an organized front and a reputation for toughness. And certainly in this case, there was no threat, ongoing threat, to society. Thank you very much. Thank you very much.
judges: G. Steven Agee, Albert Diaz, Stephanie D. Thacker